UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOUGLAS NEUBECKER,

        Plaintiff,        Hon. Ellen S. Carmody

v.

                       Case No. 1:18-cv-699

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## OPINION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. The parties have agreed to proceed in this Court for all further proceedings, including an order of final judgment. Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Secretary of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social

security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Secretary of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Secretary of Department of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Secretary of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 33 years of age on his alleged disability onset date. (PageID.200). He successfully completed high school and worked previously as a semi-truck driver. (PageID.53). Plaintiff applied for benefits on June 17, 2014, alleging that he had been disabled since April 3, 2011, due to ankylosing spondylitis, fibromyalgia, Scheuermann's disease, myositosis,[1] depression, osteoarthritis of the left sternoclavicular joint, chronic pain, and insomnia. (PageID.200-17, 236). Plaintiff's applications were denied, after which he requested a hearing before an Administrative Law Judge (ALJ). (PageID.105-98).

On November 2, 2016, Plaintiff appeared before ALJ Sarah Zimmerman with testimony being offered by Plaintiff and a vocational expert. (PageID.65-103). In a written decision dated May 31, 2017, the ALJ determined that Plaintiff was not disabled. (PageID.39-55). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (PageID.25-29). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2016. (PageID.42). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

---

[1] It appears that Plaintiff is referring to myositis, a condition characterized by inflammation of the muscles. *See* Myositis, available at https://www.webmd.com/a-to-z-guides/myositis-symptoms-treatments-prognosis#1 (last visited on July 9, 2019).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step

---

[2] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4. If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997).

The ALJ determined that Plaintiff suffered from: (1) obesity; (2) kyphosis/Scheuermann's disease; (3) degenerative disc disease of the lumbar spine; (4) osteoarthritis of the left shoulder status post reconstruction; and (5) carpal tunnel syndrome of the left upper extremity status post release, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (PageID.42-45).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) he cannot lift/carry more than 10 pounds at one time and can occasionally lift/carry items such as docket files, ledgers, and small tools; (2) during an 8-hour workday, he can sit for 6 hours and stand/walk for 4 hours; (3) he should be able to change position every 30 minutes for 5 minutes while remaining on task; (4) he can frequently climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; (5) he can frequently balance, occasionally stoop and kneel, but can never crouch or crawl; (6) he can never be exposed to hazardous heights, dangerous machinery, or excessive vibration. (PageID.45).

The ALJ found that Plaintiff was unable to perform his past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his

5

limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert reported that there existed approximately 138,000 jobs nationally which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (PageID.94-100). This represents a significant number of jobs. *See, e.g., Taskila v. Commissioner of Social Security*, 819 F.3d 902, 905 (6th Cir. 2016) ("[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant'"). Accordingly, the ALJ concluded that Plaintiff was not entitled to disability benefits.

**I.**     **Medical Evidence**

In addition to Plaintiff's testimony at the administrative hearing, the administrative record contained copies of Plaintiff's medical treatment records. The ALJ described this evidence as follows:

> The claimant is a 38-year old male who was 33 years old on the alleged onset date. He alleges he is disabled due to ankylosing spondylitis, fibromyalgia, Scheuermann's disease, myositis,

6

depression, osteoarthritis in left sternoclavicular, chronic pain, and insomnia (Ex. 2E). According to the claimant, his condition affects his ability to sit, stand, walk, lift, squat, bend, reach, kneel, climb stairs, use his hands, remember, and complete tasks. He could walk 10-15 minutes before needing to rest (Ex. 4E). At the hearing, the claimant asserted that in 2011, his pain got to the point where he had trouble getting in and out of his truck. He said he had pain all over that got worse and worse. He said he now has constant pain. He testified that he leans forward on his knees to take the pressure from his back and neck. He said the pain, when severe, makes him shake. He said his most comfortable chair is his recliner. The claimant testified that there has been no mention of surgery. He said narcotics were not effective. He said he smokes marijuana to calm his mind and help with pain. After taking the kids to school, he said he returns home, then smokes marijuana to reduce the pain so he can function. He said the marijuana will last 1-2 hours. He said he does chores and then from about 11:00 a.m. to 3:00 p.m., he has to "go inside his head." He said he picks the kids up at 3:00 p.m. and will focus on them, dinner, and chores until his wife gets home (Testimony).

The medical evidence establishes kyphosis/Scheuermann's disease, degenerative disc disease of lumbar spine, osteoarthritis of the left shoulder status post reconstruction, and left carpal tunnel syndrome status post release. A November 2009 MRI of the thoracic spine demonstrated a marked kyphotic deformity with numerous old mild-appearing wedging deformities and multiple Schmorl's-like nodes. There appeared to be thickening of the anterior longitudinal spinal ligament raising the possibility of ankylosing spondylitis and/or Scheuermann's disease (Ex. 5F/45). A 2009 MRI of the cervical spine disclosed mild degenerative changes without root compression or significant stenosis (Ex. 5F/44). A 2009 MRI of the lumbar spine showed mild degenerative disc disease with no significant central canal stenosis or neuroforaminal stenosis (Ex. 5F/41).

A March 2011 MRI of the lumbar spine revealed multilevel disc desiccation. There was no significant interval change when compared to the imaging of November 2009 (Ex. 1F/18-19, 6F/41-42). June 2011 electromyography (EMG)/nerve conduction testing of the bilateral lower extremities had essentially normal findings. There was no electrodiagnostic evidence of a generalized polyneuropathy, myopathy, motor neuron disease, right or left lumbosacral radiculopathy, plexopathy or mononeuropathy. Clinically, pain specialist Karen Meyer, D.O., suspected

fibromyalgia and ankylosing spondylitis as causes of his symptoms. The claimant's Fentanyl patch was increased (Ex. 5F/32-33).

In July 2011, rheumatologist Michael L. Mawby, M.D., diagnosed the claimant with back pain, positive HLA-B27, fibromyalgia, knee osteoarthritis, and thoracic wedge deformities. The claimant reported having lost 80 pounds over the last two years and was still losing some weight. An MRI of the thoracic spine had findings consistent with Scheuermann's disease, although ankylosing spondylitis was considered as well. A prednisone burst was ordered. Additional testing was ordered (Ex. 1F/5). X-rays of the lumbar spine, thoracic spine and sacroiliac joints disclosed suspected bilateral sacroiliitis with somewhat indistinct cortical margins and associated sclerosis, but no gross fusion or erosion. There was no evidence of spondyloarthropathies and there was mild left thoracolumbar scoliosis (Ex. 1F/16-17). Upon follow-up, Dr. Mawby stated that x-ray findings were consistent with Scheuermann's disease. There was some bone marrow edema noted, suggestive of possible inflammatory arthropathy, but since the claimant did not respond to the prednisone, an inflammatory condition was less likely. The claimant's Scheuermann's disease was stable, but not improving. A NSAID was suggested, but the claimant declined. Weight loss was recommended. Due to positive HLA-B27, possible inflammatory spondylitis was also a consideration (Ex. 1F/4). A July 2011 MRI of the lumbar spine showed moderate early disc degeneration, mild degenerative facet disease, and mild bulging of the annuli, with a slightly more focal left lateral disc protrusion at L4-5. There was no disc herniation and no significant central canal lateral recess or foraminal stenosis. There was no interval change since March 2011 (Ex. 1F/11-12, 27F/2-3).

A September 2011 MRI of the lumbar spine had no significant interval change within the multilevel degenerative changes since July 2011. There was mild bone marrow edema within the right sacral alum adjacent to the sacroiliac joint. No fluid was seen within the sacroiliac joint itself In addition, there was also subtle edema on the iliac side of the joint. On the left, there was also focal edema within the sacral alum adjacent to the sacroiliac joint, however this was less pronounced and extensive compared to the right (Ex. 1F/7-10, 6F/34-37). Dr. Mawby stated that ankylosing spondylitis could not be completely ruled out, although his suspicion for that was fairly low. It was suspected that most of the claimant's pain was due to degenerative disc disease, degenerative arthritis, and possible

neural entrapment. A second opinion at another medical center was suggested (Ex. 1F/2).

In September 2013, the claimant reported intermittent back pain. Symptoms were aggravated by bending, changing positions, daily activities, standing and walking; relieved by heat. A physical exam noted no edema in the extremities. The claimant's lumbar spine was tender. His deep tendon reflexes were preserved and symmetric. Andrew Long, D.O., diagnosed the claimant with "Schaumanns disease." Dr. Long prescribed Lyrica and referred the claimant to Dr. Meyer (Ex. 4F/5-7). An October 2013 MRI of the left shoulder was normal (Ex. 5F/38, 6F/24). X-rays of the left clavicle were normal (Ex. 5F/51). The claimant underwent an initial evaluation for physical therapy, twice a week for six weeks (Ex. 6F/108). A December 2013 CT of the left sternoclavicular joint disclosed osteoarthritis (Ex. 5F/50, 6F/10).

In January 2014, Dr. Meyer diagnosed the claimant with: pain in joint involving shoulder region (stable); pain in thoracic spine; kyphosis, Scheuermann's disease; and kyphosis (acquired) (Ex. 5F/8). Although MS Contin was prescribed originally, it was later changed to Dilaudid. A back brace was prescribed. Medical marijuana was discussed and the claimant stated that his pain was better controlled with it. He had a medical marijuana card (Ex. 5F/7-31). Three months later, the claimant saw orthopedic surgeon B. Groseclose II, M.D., regarding left shoulder pain. A physical exam noted pain with range of motion and mild swelling and tenderness of the sternoclavicular joint. There were no focal motor deficits. An injection provided a couple days' relief of symptomatology (Ex. 7F/13-16). Referral was made to Christopher Chuinard, M.D. X-rays of the left shoulder demonstrated no obvious osteoarthritis around the glenohumeraljoint. There were no signs of instability but some "ptosis of his shoulder," which the doctor believed was due to excessive kyphosis. Arthroscopic or open debridement of the joint and essentially biopsy to rule out potential infection was discussed. Further testing was ordered (Ex. 7F/8-11). An EMG of the upper extremity revealed evidence of moderate carpal tunnel syndrome of the left upper extremity, without evidence of axonal loss. There was no evidence of left upper extremity cervical radiculopathy, plexopathy or any other mononeuropathy. Carpal tunnel release was discussed (Ex. 8F/8-9).

In March 2015, Dr. Chuinard recommended doing both arthroscopic carpal tunnel and sternoclavicular stabilization at the same time (Ex.

11F/15). Following a pre-operative evaluation, the claimant was cleared for surgery (Ex. 10F/7). A slingshot brace was prescribed and fit well. The claimant was to wear the brace full time (Ex. 11F/20-21). In March, the claimant underwent left open sternoclavicular joint reconstruction and resection, and left endoscopic carpal tunnel release (Ex. 11F/22-24). A week after surgery, the claimant reported having a hard time with pain control and agreed to try Percocet. The importance of eating and staying hydrated was discussed. The claimant was to wear his sling for a full six weeks (Ex. 11F/4-5). Post-op follow-up, in July 2015, noted no swelling in the left shoulder. X-rays showed no signs of instability. The comparable SC joint views looked like the collarbone was stable. The claimant reported feeling like the shoulder was doing quite well, not giving him the previous painful popping and crepitus. He was concerned about his wrist, which was red and tender at the incision. He felt like he was losing strength. Upon palpation, there was suspected scar forming. An injection was administered (Ex. 15F/5-7). The next month, the claimant reported tightness in his shoulder and minimal pain. He had some pain in his left hand. A physical exam noted appropriate range of motion for post-op status. The left upper extremity was neurovascular status was intact (sic). X-rays showed an essentially well stabilized left sternoclavicular joint. Overall alignment looked good. The sling could be discontinued (Ex. 15F/8-9).

In September 2015, the claimant reported back pain aggravated by ascending stairs, bending, changing positions, daily activities, descending stairs, jumping, lifting, lying/resting, rolling over in bed, sitting, standing and walking. He said his symptoms were relieved by pain meds/drugs, physical therapy, and aqua therapy. A physical examination was essentially normal. A referral was made to the Pain Clinic and for physical therapy (Ex. 14F/3-7). Other treatment included tiger balm patches, naproxen, ibuprofen and acetaminophen/Tylenol (Ex. 14F/l7).

In September 2016, 16 months after his left SC joint reconstruction and carpal tunnel decompression, the claimant reported his clavicle was still tender when touched and that he gets some clicking when bringing his arm down from an overhead position. He felt he has a more forward curve to his neck that was pinching his throat at his clavicle. A physical exam of the left shoulder noted painless range of motion. A neurovascular exam of the upper extremity found sensation to light touch was intact. The claimant's reflexes were normal. X-rays of his collarbone showed no shift or instability of the

10

> distal clavicle. The SC joint appeared stable. Dr. Chuinard stated that on exam, the claimant's anterior neck did appear to be closer to his clavicle. Neck physical therapy was discussed. The claimant also had symptoms consistent with extensor intersection syndrome at the left wrist. Indocin was prescribed as needed and voltaren topical gel to use at the wrist (Ex. 17F).
>
> The claimant is somewhat obese at five feet eleven inches tall and weighing 295 pounds (Ex. 2E). He has a body mass index (BMI) of 41.1, which is in the obese range. He has been diagnosed with obesity (Ex. 4F/7, 9, 10F/7). The undersigned considered any added or accumulative effects the claimant's obesity played on his ability to function, and to perform routine movement and necessary physical activity within the work environment. In spite of his weight, clinicians observed the claimant ambulated quite well without an assistive device and retained functional range of motion. The claimant's neurological status in terms of motor power, reflex activity, and sensation were largely intact, and his musculoskeletal and extremity reviews were commonly free of clubbing, cyanosis, and edema (Ex. 4F/12, 17).

(PageID.46-49).

## II.    Medical Opinion Evidence

On September 27, 2016, Dr. Nathan Sailor completed a report describing Plaintiff's physical ability to perform work-related activities. (PageID.711-16). As detailed below, the doctor concluded that Plaintiff experienced greater physical limitations than the ALJ recognized. The ALJ, however, afforded "little weight" to Dr. Sailor's opinions. (PageID.51). Plaintiff argues that he is entitled to relief on the ground that the ALJ failed to articulate good reasons for discounting Dr. Sailor's opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Ibid.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent

12

with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Ibid.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

According to Dr. Sailor, Plaintiff experiences the following functional limitations: (1) during an 8-hour workday, Plaintiff can sit for 3 hours, stand for 3 hours, and walk for 2 hours; (2) Plaintiff can "never" perform overhead reaching activities and otherwise can only use his upper extremities occasionally to perform work activities; (3) Plaintiff can walk only 100-200 yards without using a cane or other assistive device; and (4) Plaintiff would be absent from work "more than three days a month" due to his impairments. (PageID.711-16).

In support of his decision to discount Dr. Sailor's opinion, the ALJ concluded as follows:

> The undersigned accords little weight to this opinion, as it is very restrictive with no explanation as to why each restriction is needed. Physical examinations by Dr. Sailor are essentially normal (Ex.

13

> 14F/2, 6-7, 9, 13, 17). Additionally, Dr. Sailor's opinion that
> limitations have been in effect since 2011 was not based upon
> personal knowledge, since it appears that the first clinical visit with
> the claimant was in September 2015. Dr. Sailor did not identify
> other bases for forming this opinion for the period prior to
> September 2015 (Ex. 14F/1). The undersigned further notes that Dr.
> Sailor's opinion is inconsistent with much of the evidence described
> above in detail in this section. Nevertheless, the undersigned did
> consider portions of Dr. Sailor's opinion when limiting the claimant
> to a sedentary exertion.

(PageID.51).

Dr. Sailor first examined Plaintiff in September 2015. (PageID.680-83). Nevertheless, the doctor asserted that the limitations he identified were in effect as of 2011. As the ALJ correctly noted, however, the doctor offered no basis for opining as to limitations Plaintiff allegedly experienced four years before he even examined him. As the ALJ also observed, the results of Dr. Sailor's few examinations of Plaintiff revealed findings inconsistent with his subsequent opinion. (PageID.680-96). Rather, the doctor reported that Plaintiff's symptoms were relieved by over the counter medication and physical therapy. (PageID.680, 684). These two justifications alone are sufficient to discount Dr. Sailor's opinion. As the ALJ further observed, however, the other medical evidence of record does not support Dr. Sailor's opinion, as the discussion above reveals. Accordingly, this argument is rejected.

**III.     The ALJ's RFC Assessment is Supported by Substantial Evidence**

A claimant's RFC represents the "most [a claimant] can still do despite [his] limitations." *Sullivan v. Commissioner of Social Security*, 595 Fed. Appx. 502, 505 (6th Cir., Dec. 12, 2014); *see also*, Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996) (a claimant's RFC represents her ability to perform "work-related

physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule"). As noted above, the ALJ concluded that Plaintiff retained the ability to perform a limited range of sedentary work. Plaintiff argues that he is entitled to relief because the ALJ's RFC assessment is "hallucinatory" and "detached from reality." (ECF No. 11 at PageID.947-48).

In support of his argument, Plaintiff argues that he suffers from severe impairments and has identified isolated portions of the medical record which arguably support his contention that he is more limited that the ALJ concluded. First, there is no dispute that Plaintiff suffers from severe impairments. The ALJ recognized such and limited Plaintiff to a range of sedentary work. Second, it is almost always the case that the record contains evidence supporting alternative findings and conclusions. As noted above, however, the fact that the evidence would support a different result is not a sufficient ground to obtain relief. Instead, the question is whether the ALJ's decision regarding Plaintiff's RFC is supported by substantial evidence. As the ALJ's discussion of the evidence reveals, such is the case. Accordingly, this argument is rejected.

## IV. The ALJ Properly Considered Plaintiff's Obesity

Plaintiff argues that the ALJ failed to comply with Social Security Ruling 02-1p, Titles II and XVI: Evaluation of Obesity, 2000 WL 628049 (S.S.R., Sept. 12, 2002). Specifically, Plaintiff argues that the ALJ erred by failing to adequately consider his obesity and the effect of such on his RFC.

As the Sixth Circuit has held, Social Security Ruling 02-1p "does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v.*

15

*Commissioner of Social Security*, 359 Fed. Appx. 574, 577 (6th Cir., Dec. 22, 2009); *see also*, *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir., Jan. 31, 2006) ("[i]t is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants"). The ALJ recognized that Plaintiff's obesity constituted a severe impairment and examined the entire record in assessing Plaintiff's residual functional capacity. The evidence of record does not support the argument that Plaintiff's obesity, either alone or in combination with her other impairments, impairs him to an extent greater than that recognized by the ALJ. Accordingly, this argument is rejected.[3]

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.

Dated: July 19, 2019          /s/ Ellen S. Carmody
                              ELLEN S. CARMODY
                              U.S. Magistrate Judge

---

[3] In his Statement of Errors, Plaintiff also asserts that the ALJ erred "by limiting Plaintiff's credibility due to his daily activities." (ECF No. 11 at PageID.946). This argument was not sufficiently developed, however, and is, therefore, waived. *See, e.g., Zizzo v. Commissioner of Social Security*, 2013 WL 5291663 at *8 (E.D. Mich., Sept. 19, 2013) (courts do not engage in a self-directed inquiry into the facts because "judges are not like pigs, hunting for truffles buried in" the record); *Porzillo v. Department of Health and Human Services*, 369 Fed. Appx. 123, 132 (Fed. Cir., Mar. 12, 2010) (claimant "waves any arguments that are not developed"); *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 537 n.25 (10th Cir. 2000) (arguments "superficially" developed are waived)